PENNSYLVANIA CASUALTY COMPANY

V.

CHRIS SIMOPOULOS, M.D., LTD., ET AL.

Record No. 860164

June 10, 1988

Present: All the Justices

*Christopher C. Spencer (Rosewell Page, III; McGuire, Woods & Battle,* on briefs), for appellant.

*H. Joel Weintraub (Decker, Cardon, Thomas, Weintraub, Hitchings & Burgess,* on brief), for appellee Parvis Modaber.

No briefs or arguments for appellees Chris Simopoulos, M.D., Ltd. and Chris Simopoulos, Individually and d/b/a/ American Women's Clinic.

CARRICO, C.J., delivered the opinion of the Court.

In this case involving medical malpractice insurance, the trial court held that, although the insured gave false answers to questions in the application for insurance, the insurer was estopped from avoiding coverage because the application also contained several unanswered questions, about which the insurer failed to inquire. Finding that the court's holding was erroneous, we will reverse.

At pertinent times, the insurer, Pennsylvania Casualty Company, was engaged in writing medical malpractice insurance in this Commonwealth. The insured, Chris Simopoulos, M.D., a gynecologist, and his professional corporation, Chris Simopoulos, M.D., Ltd., had offices in Falls Church, Norfolk, and Woodbridge in Prince William County. Robert Rousseau was an employee of a Woodbridge insurance agency, and for several years prior to 1983

had placed Simopoulos' medical malpractice insurance with St. Paul Insurance Company.

In 1983, Rousseau's agency ceased placing medical malpractice insurance with St. Paul and switched to Pennsylvania Casualty because of the latter's "lesser premium" rates. On November 18, 1983, Rousseau took an application from Simopoulos for a policy with Pennsylvania Casualty providing coverage for himself and his professional corporation. In Simopoulos' presence and reflecting his direct responses, Rousseau placed an "x" in the "No" block after each of the following questions:

16. Has your license to practice medicine or your permit to prescribe or dispense drugs ever been denied, revoked, suspended or in any way limited?

17. Have your staff privileges at any institution ever been suspended or in any way restricted?

23. Have you ever been convicted of a crime (other than a motor vehicle citation)?

Simopoulos signed the application, and Rousseau forwarded it to Pennsylvania Casualty. Effective January 1, 1984, Pennsylvania Casualty issued two policies, one a regular medical malpractice policy and the other an "umbrella policy," insuring Simopoulos and his professional corporation for one year.

In August 1984, during the term of the policies, Robin L. Roundtree asserted a medical malpractice claim against Simopoulos in Norfolk. Receiving notice of the claim, Pennsylvania Casualty employed Donnell R. Davis, a Norfolk attorney, to defend Simopoulos. On August 31, 1984, Davis wrote Pennsylvania Casualty stating that Simopoulos had been only recently arrested in Norfolk "while preparing to perform an abortion on a policewoman who was not pregnant." Davis also indicated in his letter that several of the answers Simopoulos had given to questions in the 1983 application for insurance were false.

Pennsylvania Casualty then instituted this declaratory judgment proceeding against Simopoulos and his professional corporation as well as Roundtree and two other women, Sandra Stokes and Barbara Lynette Smith, who had asserted claims against Simopoulos. Also included as a defendant was Parviz (or Parvis) Modaber, M.D., a former associate of Simopoulos, who was alleged by Roundtree and Stokes to have caused their injuries. In the motion

for judgment, Pennsylvania Casualty sought a declaration that the two policies in question were void *ab initio* because Simopoulos had "knowingly and willfully misrepresented material facts" in the application for insurance.

Simopoulos could not be found and was never served with process. Modaber, Roundtree, Stokes, and Smith filed responsive pleadings alleging, *inter alia*, that Pennsylvania Casualty was estopped from asserting the invalidity of the policies in question. Modaber also alleged in his responsive pleading that "at all times relevant he was an agent, servant, or employee" of Simopoulos.

At trial, Pennsylvania Casualty introduced into evidence the following exhibits:

A copy of an order of the Circuit Court of Fairfax County showing that Simopoulos had been convicted on April 16, 1980, of performing an abortion outside a hospital during the second trimester of pregnancy;[1]

A copy of the opinion of this Court affirming Simopoulos' conviction. *Simopoulos* v. *Commonwealth*, 221 Va. 1059, 277 S.E.2d 194 (1981);

A copy of the opinion of the Supreme Court of the United States affirming the judgment of this Court. *Simopoulos* v. *Virginia*, 462 U.S. 506 (1983);

A copy of an order of the Virginia State Board of Medicine entered May 23, 1980, revoking Simopoulos' license to practice medicine in this Commonwealth;

Copies of letters addressed to Simopoulos from the administrators of Commonwealth Hospital, Fairfax Hospital, and Potomac Hospital, revoking Simopoulos' membership on the staffs of the three hospitals;

A copy of the opinion of the United States Court of Appeals for the Fourth Circuit affirming a district court's judgment denying Simopoulos' § 1983 action in which he sought injunctive relief from any restriction upon, or suspension of, his right to practice medicine in Virginia or to continue as a staff member of Fairfax Hospital and Potomac Hospital.

---

[1] Simopoulos was sentenced to serve two years in the penitentiary for his conviction, but the sentence was suspended on condition that he serve thirty days in jail.

*Simopoulos* v. *Virginia State Bd. of Medicine*, 644 F.2d 321 (4th Cir. 1981).[2]

The trial court found that Simopoulos had made material misrepresentations of fact in the application for insurance. This finding was based upon ample evidence, and it has not been questioned on appeal. Accordingly, we need not consider further the falsity or materiality of the answers Simopoulos gave in response to questions 16, 17, and 23 of the application. The trial court held, however, that Pennsylvania Casualty was estopped from relying on the misrepresentations to deny coverage because it issued the policies despite the fact several questions were left unanswered in the application for insurance.

Among the questions left unanswered were three whose answers, in the view of Pennsylvania Casualty's chief underwriter, would have affected the risk. Question 15 sought information concerning surgical procedures the applicant performed; question 19 queried whether any claim or suit had previously been brought against the applicant; and question 24(b) asked for an explanation of the applicant's "informed consent practices/procedures." Also left unanswered were question 10, which asked for the hours per week the applicant engaged in private practice, and question 12, which inquired about the hours per week the applicant spent on "outside interests/hobbies."

Modaber is the only appellee to file a brief on appeal.[3] He argues that the unanswered questions in the application for insurance put Pennsylvania Casualty to the duty of inquiring into the truth of the answers Simopoulos actually gave and, because the Company failed to inquire, it is estopped from relying upon the false answers in its attempt to avoid coverage.

■ Citing *Employers Ins. Co.* v. *Great American*, 214 Va. 410, 200 S.E.2d 560 (1973), Modaber contends it is not necessary to show that an insurer or its agent had actual knowledge of an applicant's fraud. It is enough under *Employers*, Modaber says, to show that the insurer has "knowledge of facts sufficient to put a

---

[2] In August 1981, the State Board of Medicine ordered that Simopoulos' license to practice "be reinstated on PROBATION for two years" on condition that he not perform "any induced or elective abortions for a period of two years." His hospital staff privileges were also reinstated.

[3] After the oral argument in this case, we were notified that settlement had been reached between Pennsylvania Casualty and Robin Roundtree, Sandra Stokes, and Barbara Lynette Smith, and the three women have been dismissed as parties to this appeal.

reasonably prudent person upon inquiry of the possibility of fraud." *Id*. at 413, 200 S.E.2d at 563.

▇ Despite Modaber's protestations to the contrary, there is absolutely no evidence in the record to suggest that either Rousseau or Pennsylvania Casualty, at the time the policies were issued, had any knowledge of Simopoulos' criminal conviction, license revocation, or staff-privilege suspension. Application of the *Employers* rule depends upon *knowledge of facts* to put the insurer "upon inquiry of the possibility of fraud," *id.*, and the unanswered questions on the insurance application simply were insufficient for this purpose.

▇ The burden "rests upon the party relying on the doctrine of estoppel to prove each element by clear, precise and unequivocal evidence." *John Hancock Mutual v. Va. Nat. Bank*, 212 Va. 31, 33, 181 S.E.2d 618, 620 (1971). This burden required Modaber to prove that Pennsylvania Casualty had knowledge, actual or imputed,[4] of facts which would render its coverage void *ab initio*, yet issued the policies in question notwithstanding such knowledge. *North River Co. v. Belcher*, 155 Va. 588, 603, 155 S.E. 699, 703 (1930).

▇ Estoppel is an equitable doctrine, and one cannot "base a claim for an estoppel upon . . . acts . . . which were induced by his own acts, and *a fortiori* on those induced by his own fraud or false representations." *Luck Const. Co. v. Russell Co.*, 115 Va. 335, 342, 79 S.E. 393, 395 (1913). Simopoulos put his fraudulent scheme into motion by his false answers to questions 16, 17, and 23 of the application for insurance and thus wrongfully procured the issuance of the policies. Because Simopolous had unclean hands, he had no standing in equity to interpose a plea of estoppel. Modaber, as well as Roundtree, Stokes, and Smith, stand "in the same shoes as [Simopoulos]," *Ampy v. Insurance Company*, 200 Va. 396, 399, 105 S.E.2d 839, 843 (1958), and are in no better position than Simopolous to sustain an estoppel.

For the reasons assigned, we will reverse the judgment of the trial court and enter final judgment here in favor of Pennsylvania Casualty declaring the two policies in question void *ab initio*.

*Reversed and final judgment.*

---

[4] As Pennsylvania Casualty points out, "imputed knowledge" in this context means knowledge charged to the principal because received by the agent in the scope of employment.